USCA1 Opinion

 

 September 3, 1996 United States Court of Appeals For the First Circuit ____________________ No. 96-1763 UNITED STATES OF AMERICA, Appellee, v. DANIEL D. TAVARES, Appellant. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this Court issued on August 21, 1996, is corrected as follows: On page 15, line 23: replace "inch deep" with "inch long" United States Court of Appeals For the First Circuit ____________________ No. 95-1763 UNITED STATES OF AMERICA, Appellee, v. DANIEL D. TAVARES, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Kevin S. Nixon for appellant. ______________ Daniel D. Tavares, on brief pro se. _________________ ___ __ Michael J. Pelgro, Assistant United States Attorney, with whom __________________ Donald K. Stern, United States Attorney, was on brief for the United ________________ States. ____________________   August 21, 1996 ____________________ LYNCH, Circuit Judge. An early-morning assault in LYNCH, Circuit Judge. _____________ Mashpee, Massachusetts, on August 29, 1991, resulted in a chase through nearby woods and the arrest of Daniel D. Tavares. On May 15, 1992, Tavares was convicted of violating 18 U.S.C. 922(g), the felon in possession of a firearm statute. Tavares appealed, and this court, sitting en banc, __ ____ reversed his conviction on the ground that the district court's decision to allow the government to prove the "prior felon" element of Section 922(g) rather than accept a defense stipulation created unfair prejudice. See United States v. ___ _____________ Tavares, 21 F.3d 1 (1st Cir. 1994) (en banc). There was a _______ __ ____ second trial and, on March 30, 1995, Tavares was again found guilty. He appeals, asserting: (i) a variety of trial errors in a pro se submission; and (ii) two sentencing errors ___ __ through a counsel assisted submission. We affirm the district court on the claimed trial errors, but vacate and remand on the sentencing issues. I. __ On August 29, 1991, Tavares and his companion, Cyril Pocknett, Jr., were in a confrontation with Sheldon Blake and Rodney Hunt over accusations of the theft of a car stereo. Threats were exchanged, but no violence ensued, and Tavares and Pocknett left the area. Blake and Hunt then went to Blake's apartment. Blake lived in a second-floor apartment with his girlfriend, Nicole Cain, and their infant daughter. About an hour and a half later, Tavares and -3- 3 Pocknett returned and buzzed Blake's front door. Hunt opened the door and Tavares greeted him with a shotgun to the head and the words, "What's up now, motherfucker?" Standing next to Tavares was Pocknett, aiming a .22 caliber rifle at Hunt. Acting on instinct, Hunt grabbed the barrels of both rifles, pushed them down, and fled up the stairs into Blake's apartment. Tavares then fired his shotgun repeatedly into Blake's nearby parked car. Meanwhile, Hunt noticed that his hand was bleeding. Apparently, in grabbing the barrel of Tavares' shotgun, he had ripped the palm of his hand on the gun's sight. Cain, on hearing the gunshots, rushed to her daughter's bedroom to protect her from danger. After the shots subsided, she looked out the window and saw Tavares and Pocknett running toward the nearby woods. Shortly thereafter, the police arrived. They searched the woods, and after a chase, captured Tavares. They also found the shotgun and .22 caliber rifle, hidden under pine needles.  Back at the apartment building, Hunt, whose right hand was bleeding profusely, wrapped it in a rag which soon became bloodsoaked. On entering the building, Officer Alan Roguzac observed pools of blood in both the hallway and on the carpeting leading up to Blake's apartment. Soon after, on seeing Hunt's wound, Roguzac radioed for an ambulance. -4- 4 Hunt was taken to the Falmouth Hospital emergency room, where his hand received eight stitches. Cain, Blake and Hunt were interviewed by the police. Specifically, Cain spoke to Sergeant David Mace and Detective Doris Dottridge. Trial _____ Cain did not testify at Tavares' first trial. At his second trial, however, she testified that on the night of the incident she had told a male police officer and Dottridge that she had seen Tavares with a gun. Dottridge could not recollect any such statement by Cain, but Mace testified that he was the male police officer to whom Cain had made her statement. Tavares attacked Mace's testimony by pointing out that Mace's police report did not specifically report Cain's statement. Instead, Mace's report said only that "they" had seen Tavares with a gun. Tavares argued that "they" meant only Hunt and Blake, whereas Mace asserted that "they" included Cain as well. At the conclusion of the six-day second trial, the jury requested the transcripts of the testimony of Cain, Hunt, Blake, and Earl Cash, another witness. The court explained to the jury that, thanks to the court reporter's personal investment in certain equipment, the court had the unusual ability to provide them with transcripts within a short period of time. The court noted, however, that despite -5- 5 the reporter's speed, skill and equipment, since the reporter was needed on a different case the next morning, he might not be able to satisfy all of the jury's requests, and that the jury was to proceed in its deliberations nevertheless. The next morning, the jury was provided with the transcripts for Cain, Hunt, and Cash, but not Blake. The court told the jury that, if possible, it would get them the transcript of Blake's testimony, but reiterated that they should proceed regardless. Within a little over an hour, and without having received the transcript of Blake's testimony, the jury returned a verdict of guilty. Sentencing __________ Tavares was sentenced to ten years in prison. The guideline applicable to his offense of conviction was Section 2K2.1 (unlawful possession of a firearm). See U.S.S.G.  ___ 2K2.1 (Nov. 1990).1 The court then applied Section 2A2.2 (aggravated assault) by way of a cross-reference in Section 2K2.1.2 As a result of applying the cross-reference, Tavares' offense level jumped from twelve to twenty-three. Level twenty-three represented a starting offense level of fifteen for aggravated assault plus an increase of eight levels for specific offense characteristics -- a three-level  ____________________ 1. The court applied the version of the Guidelines in effect at the time of Tavares' offense. Neither party contends that a different version should apply. 2. See U.S.S.G. 2K2.1(c)(2) and 2X1.1(c)(1).  ___ -6- 6 increase for the victim's bodily injury and a five-level increase for the discharge of a firearm. The Pre-Sentence Investigation Report recommended that the court sentence Tavares under the aggravated assault guideline because he had pointed a loaded shotgun at his victim's head, thereby evincing an "intent to do bodily harm." See U.S.S.G.  ___ 2A2.2, comment. (n.1(a)). The Guidelines define "aggravated assault" as "a felonious assault that involved" either "a dangerous weapon with intent to do bodily harm (i.e., not ____ merely to frighten)" or "serious bodily injury" or "intent to commit another felony." U.S.S.G. 2A2.2, comment. (n.1). At sentencing, however, Tavares protested that there was insufficient record support for either a finding that he had had the requisite intent to do bodily harm or a finding that serious bodily injury had resulted. Instead, he said, the evidence showed that he had merely meant to frighten his victim. Additionally, Tavares argued that, under the Guidelines, a serious bodily injury was one that required hospitalization or surgery. The government argued that the injury Tavares' victim had suffered, i.e., a cut to ____ the hand requiring a trip to the emergency room and eight stitches, was in fact a serious bodily injury within the Guidelines' definition. See id. and U.S.S.G. 1B1.1, ___ ___ comment. (n.1(j)). The court accepted this argument. The -7- 7 resulting Guidelines sentencing range, given Tavares' criminal history category ("CHC") of IV, was 70-87 months. The sentencing court then departed upward by two CHC levels and one offense level to achieve a final sentencing range of 110-125 months. See U.S.S.G. 4A1.3, ___ p.s. (departures beyond CHC VI may occasionally be appropriate in cases of an "egregious, serious criminal record"). The court's stated basis for the upward departure was that Tavares had, in fact, committed three state crimes (that had resulted in "guilty filed" dispositions as opposed to outright convictions3) that were not counted in his CHC score and that a CHC of IV did not adequately reflect the true seriousness of Tavares' chronic criminality. Tavares appeals, asserting errors in both the trial and sentencing. II. ___ Trial _____  ____________________ 3. "Guilty filed" dispositions in the Commonwealth of Massachusetts involve an admission of sufficient facts for a possible finding of guilt, but not an explicit admission of guilt. The primary focus of the sentencing hearing after Tavares' second federal trial was whether three of his "guilty filed" dispositions counted as predicate convictions under the Armed Career Criminal Act ("ACCA"). See 18 U.S.C. ___ 924(e). The sentencing court ruled that the "guilty filed" dispositions could not be counted as convictions under the ACCA. The court explained, however, that as there was sufficient evidence that Tavares had in fact committed the state crimes, and because, had they been convictions, they would have resulted in a minimum federal sentence of fifteen years, it was going to depart upward and sentence Tavares to ten years.  -8- 8 Tavares' pro se brief asserts that the district ___ __ court committed reversible error in: (i) failing to provide the jury with a transcript of a particular witness' testimony that it had requested and instructing the jurors that they should proceed to deliberate without that transcript; (ii) permitting the jury to "view" the allegedly perjured testimony of a witness; (iii) failing to ask the jury whether its request for transcripts pertained to the instant trial or prior proceedings. Because contemporaneous objections were not made with respect to any of the claims, review is for plain error. See, e.g., United States v. Cruz-Kuilan, 75 ___ ____ _____________ ___________ F.3d 59, 62 (1st Cir. 1996). We discern no miscarriage of justice and Tavares' claims fail this review. See, e.g., ___ ____ United States v. Sullivan, 85 F.3d 743, 751 (1st Cir. 1996). _____________ ________ A. Failure to Provide Transcript  ________________________________ After deliberations commenced, the jury asked to review the testimony of four witnesses: Cain, Hunt, Cash and Blake. The next morning, the court was able to provide the jury with transcripts for Cain, Hunt and Cash, but Blake's was not yet ready. The court reporter was needed on another case and the court told the jurors that, if possible, they would be provided with the transcript, but that they should proceed with their deliberations regardless. Tavares argues that this was reversible error. -9- 9 Decisions regarding the provision of trial transcripts to the jury are within the discretion of the trial judge. See United States v. Akitoye, 923 F.2d 221, 226 ___ _____________ _______ (1st Cir. 1991) (decision as to whether requested testimony should be reread to jury rests in trial court's discretion). In making its decision, the trial judge is to consider factors such as the ease or difficulty of compliance with the jury's request and what is likely to be gained or lost. Id. ___ The court here provided the jury with three of the four transcripts requested. The one transcript not provided was that of Blake, who had testified most recently, and that was because the court reporter was needed for another case. Cf. ___ id. (where testimony is fresh in jury's mind there is less of ___ a need for rereading). We discern no plain error either in the non-provision of the transcript or in the instruction that the jury should continue deliberations. B. Perjured Testimony _____________________ Tavares argues that the court erred in permitting the jury to "view" the perjured testimony of Cain, a government witness.4 Tavares further asserts that the government knew or should have known that not only was Cain's testimony perjured, but that the supporting testimony of Sergeant Mace was perjured as well. Tavares, however, has  ____________________ 4. We assume that Tavares is referring to the court's provision of the jury with the transcript of Cain's testimony during deliberations. -10- 10 not shown that either witness committed perjury. And so the argument fails for want of a foundational piece. Cain testified at the instant trial that: (a) on the night of the incident, she saw Tavares with a gun; and (b) that she had told this to the police on the scene. Cain did not, however, testify at Tavares' first trial. Tavares says that her testimony at the instant trial must have been perjured because there was no record of her having related this information to the police on the night in question. Tavares theorizes that the government, having been reversed once, used perjured testimony to ensure its victory in the second trial. As support, he points to the testimony of Dottridge, one of the officers whom Cain allegedly told of having seen Tavares with a gun. Dottridge testified that she could not recall Cain having stated that she saw Tavares with a gun. There was, however, testimony from Dottridge's colleague, Mace, that he had heard Cain's statement. But Tavares says that Mace's testimony must have been perjury as well because Mace's police report did not state specifically that Cain had seen Tavares with a gun. Instead, Mace's report stated that "they" had seen Tavares with a gun, without specifying which witnesses "they" referred to. "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set -11- 11 aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976) (footnotes _____________ _____ omitted). Under federal law, perjury occurs when a "witness testifying under oath or affirmation . . . gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. _____________ Dunnigan, 507 U.S. 87, 94 (1993) (referring to the definition ________ of perjury under 18 U.S.C. 1621). Tavares, however, has pointed to no more than an inconsistency (between Cain's testimony and that of Dottridge) and an unclear police report (that of Mace). Inconsistent testimony by itself does not amount to perjury, nor does an unclear police report make it so. See United States v. Gary, 74 F.3d 304, 314 (1st Cir.) ___ _____________ ____ ("it is axiomatic that inconsistent testimony is not per se ___ __ perjurious"), cert. denied, 116 S.Ct. 2567 (1996). Further, _____ ______ the fact that Cain did not testify at Tavares' first trial, but did at the second, avails Tavares naught. See Anderson ___ ________ v. United States, 403 F.2d 451, 454 (7th Cir. 1968) ______________ (inconsistency in witness' testimony between trials is not, alone, enough to show perjury), cert. denied, 394 U.S. 903 _____ ______ (1969); cf. United States v. Lebon, 4 F.3d 1, 2 (1st Cir. ___ _____________ _____ 1993) (defendant did not show perjury merely by showing that witness changed her story between post-arrest interview and -12- 12 trial). Tavares made no request that the trial court make a finding of perjury. We decline his invitation that we now find willful intent to provide false testimony based on no more than an inconsistency in testimony and a dispute over the clarity of a police report. C. Transcript From Prior Trial  _______________________________ Tavares' final trial-related claim is that the court misunderstood the jury's request for transcripts and sent in the wrong transcripts. The court sent in the transcripts of the instant trial, but Tavares says that the ______________ jury was, in fact, requesting the transcripts of his prior _____ trial for the same offense. The claim is unavailing. _____ To the extent there was ambiguity in the jury's request for transcripts, Tavares had the ability to contemporaneously request clarification. He did not do so. Nor has Tavares pointed to any sign that the jury thought that they had been given the wrong transcripts. We reject the claim. III. ____ Sentencing  __________ In his counsel-assisted submission, Tavares claims that the sentencing court erred in: (i) determining that he had committed an aggravated assault and that his sentence was thus governed by Section 2A2.2; and (ii) in determining that he had an egregious, serious criminal record that, under -13- 13 Section 4A1.3, warranted an upward departure from the Guidelines' recommended range of 70-87 months to a sentence of 120 months.5 A. Aggravated Assault _____________________ Tavares argues that the sentencing court erred in determining that his offense was an aggravated assault within the meaning of Section 2A2.2. However, because of a fact- based internal inconsistency in the court's application of Section 2A2.2, we are unable to decide the merits of Tavares' challenge and remand for clarification and resentencing. The aggravated assault guideline is structured so that a victim's serious bodily injury both functions as a trigger for the application of the guideline as a whole and ___ provides a basis, in applying the guideline, for an additional upward offense level adjustment. In effect, the guideline provides two separate opportunities for a court to give effect to a finding of serious bodily injury. See ___ United States v. Newman, 982 F.2d 665, 673-75 (1st Cir. 1992) _____________ ______ (double counting of victim's serious bodily injury permissible under Section 2A2.2), cert. denied, 510 U.S. 812 _____ ______ (1993). Here, the sentencing court appeared to determine that the victim had suffered serious bodily injury for purposes of deciding the applicability, vel non, of the ___ ___ aggravated assault guideline, but also determined that the  ____________________ 5. Tavares' pro se brief raises the same sentencing issues, ___ __ albeit with less clarity. We, therefore, focus on his counsel-assisted submission.  -14- 14 victim had suffered something less than serious bodily injury ____ for purposes of applying the guideline's internal provisions for offense level adjustment. The Guidelines define aggravated assault as a felonious assault involving: (a) a dangerous weapon with intent to do bodily harm (i.e., not merely to ____ frighten), or (b) serious bodily injury, or (c) an intent to commit another felony. U.S.S.G. 2A2.2, comment. (n.1). Serious bodily injury, in turn, is defined as: [(i)] injury involving extreme pain or the impairment of a function of a bodily member, organ or mental faculty; or [(ii)] requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.6 U.S.S.G. 1B1.1, comment. (n.1(j)). Tavares caused his victim to suffer a laceration to the hand that required a trip to the emergency room and eight stitches. The court determined that that injury was sufficiently analogous to an injury requiring surgery, hospitalization, or physical rehabilitation to fall within the definition of serious bodily injury; thus, Section 2A2.2 applied.  ____________________ 6. In contrast, "bodily injury" is defined as "any significant injury; e.g., an injury that is painful and ____ obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. 1B1.1, comment. (n.1(b)).  -15- 15 The court did not find on the record before it that the brandishing of the shotgun itself was done with the "intent to do bodily harm." Absent such a finding, the aggravated assault determination could not be premised on note 1, part (a), of the commentary to Section 2A2.2. While such an intent may in fact have been present, the record before the district court did not require such a finding. We, therefore, cannot rest an affirmance on such a ground. The next step was to calculate adjustments to Tavares' offense level under the specific offense adjustment provisions of the aggravated assault guideline. The aggravated assault guideline provides for different increases in the offense level, depending on the seriousness of the victim's injury: If the victim sustained bodily injury, increase the offense level according to the seriousness of the injury: Degree of Bodily Injury Increase in Level _______________________ _________________ (A) Bodily Injury add 2 (B) Serious Bodily Injury add 4 _____________________ (C) Permanent or Life-Threatening  Bodily Injury add 6 (D)If the degree of injury is between that ________________________________________________ specified _________ in subdivision (A) and (B), add 3 levels; or _________________________________________ (E)If the degree of injury is between that specified in subdivisions (B) and (C), add 5 levels. -16- 16 U.S.S.G. 2A2.2(b)(3) (emphasis added). The sentencing court increased Tavares' offense level by three. A three _____ level increase applies when the magnitude of the victim's injury is between bodily injury and serious bodily injury. _______ See U.S.S.G. 2A2.2(b)(3)(D). But this determination -- ___ that the victim's injury was less than a serious bodily ____ injury -- is in direct conflict with the court's basis for applying the aggravated assault guideline in the first place, i.e., that the victim had suffered a serious bodily injury.7 ____ Were the inconsistency in the court's application of Section 2A2.2 a purely legal matter, we might be able to resolve it ourselves, without the need to remand. But we do not think that the question can be reduced to a purely legal one. Depending on context, an inch long laceration requiring eight stitches might or might not constitute serious bodily injury. For example, if there was a great deal of blood loss, or the victim was a hemophiliac, such an injury might well be thought serious. More generally, we cannot say that the victim's injury in this case is of a kind that would ____ categorically call for its characterization as "serious" or _____________ not. Lacerations can be life-threatening or trivial; where  ____________________ 7. We note that a three level increase in offense level would not have produced such a conflict if the court's decision to apply Section 2A2.2 had been premised on a determination that there was an "intent to do bodily harm." See U.S.S.G. 2A2.2, comment. (n.1(a)).  ___ -17- 17 on the sliding scale of severity a particular laceration falls is not a determination that can be made solely as a matter of law. As explained in Newman, we review the sentencing ______ court's "fact dominated evaluative judgment" of the seriousness of the victim's injury for clear error. 982 F.2d at 671. This is not a case in which the record either clearly precludes or mandates a finding of serious bodily injury. In the context of clear error review, it is not for this court to choose between two mutually inconsistent fact- based determinations that each has some plausibility in light of the record. Since, on this record, we cannot reconcile or resolve the sentencing court's dual findings of the severity of the victim's injury, we are left no alternative but to vacate the sentence and remand for resentencing. The district court is free to make new findings or reconsider the basis for the adjustment entirely. Cf. United States v. ___ _____________ Wester, __ F.3d __, __, slip op. at 21, No. 95-1143 (1st Cir. ______ July 22, 1996).  B. Egregious, Serious Criminal Record _____________________________________ Tavares next argues that the court erred in departing upward from the recommended 70-87 month sentencing range (that applied as a result of applying the aggravated assault guideline) to a sentence of 120 months. The sentencing court made the departure because it determined -18- 18 that the CHC of IV that had produced the 70-87 month recommended range did not adequately reflect Tavares' extensive criminal record. It therefore increased Tavares' CHC level by two, to CHC VI (the Guidelines' highest level, resulting in a sentencing range of 92-115 months), and then within CHC VI, departed higher still, to a sentence of 120 months. The Guidelines, in the proper circumstances, encourage departures in CHC levels, but, for departures beyond CHC VI, require that the defendant have an "egregious, serious criminal record." U.S.S.G. 4A1.3, p.s.; see also ___ ____ United States v. Doe, 18 F.3d 41, 48-49 (1st Cir. 1994); ______________ ___ United States v. Mendez-Colon, 15 F.3d 188, 190 (1st Cir. _____________ ____________ 1994). Tavares argues that his criminal record was not egregious and serious and that the sentencing court erred in determining so. The sentencing court explained that had Tavares' three "guilty filed" dispositions from the state court been convictions, a minimum sentence of fifteen years would have resulted under the ACCA. See 18 U.S.C. 924(e). Since ___ there were sufficient facts for the court to find by a preponderance of the evidence that the three state crimes were in fact committed, it found a ten year sentence appropriate. Based on Tavares' extensive criminal history, we see no abuse of discretion in the court's upward CHC departure. See United States v. Koon, 116 S. Ct. 2035, 2047- ___ _____________ ____ -19- 19 48 (1996) (abuse of discretion standard appropriate when examining district court's decision to depart from the Guidelines). Similarly, we see no abuse of discretion in the extent of the departure. See id. However, since the ___ ___ sentencing court's offense level determination is in question, we leave it to the sentencing court to redetermine, on remand, the extent of CHC departure warranted. 77 IV. ___ The judgment of conviction is affirmed. The ________ sentence, however, is vacated, and the case is remanded for _______ ________ resentencing.    -20- 20