<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 97-1659

                         UNITED STATES,

                           Appellee,

                               v.

              LUIS CANDELARIA-SILVA, A/K/A CANDY,

                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

         [Hon. Jos Antonio Fust, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                Lynch and Lipez, Circuit Judges.

                     _____________________

   Thomas R. Lincoln, by appointment of the Court, with whom Law
Offices of Thomas R. Lincoln was on brief, for appellant.
   Grace Chung Becker, Trial Attorney, Narcotic and Dangerous
Drug Division, Criminal Division, U.S. Department of Justice, with
whom James K. Robinson, Assistant Attorney General, Criminal
Division, U.S. Department of Justice, and Theresa M.B Van Vliet,
Chief, Narcotic and Dangerous Drug Division, Criminal Division,
U.S. Department of Justice, were on brief, for appellee.

                      ____________________

                      December 10, 1998
                                
                     ____________________

         TORRUELLA, Chief Judge.  Following a jury trial,
appellant Luis Candelaria-Silva ("Candelaria-Silva") was convicted
of conspiracy to possess with intent to distribute and distribution
of amounts in excess of fifty grams of cocaine base, five kilograms
of cocaine, one kilogram of heroin and an undetermined amount of
marijuana, in violation of 21 U.S.C.  841(a)(1) & 846.  
Candelaria-Silva was additionally convicted on a criminal
forfeiture count.  On appeal, he raises numerous evidentiary and
procedural issues.  For the following reasons, we affirm.
                           BACKGROUND
         We review the facts of a criminal case on appeal from a
conviction in the light most favorable to the verdict.  See United
States v. Gonzlez-Maldonado, 115 F.3d 9, 12 (1st Cir. 1997).  We  
sketch the facts presented at trial, providing further details as
they become relevant to the discussion.
         Candelaria-Silva belonged to a drug distribution ring led
by Israel Santiago-Lugo.  Santiago-Lugo's organization distributed
heroin (known by the brand name "Cristal"), cocaine powder, crack
cocaine, and marijuana.  The drugs were distributed at a number of
puntos -- drug distribution points.  Each punto consisted of a
supervisor and several employees such as lookouts, vendors,
runners, etc.
    Candelaria-Silva, along with his mother and two brothers,
ran the punto in the Villa Evangelina housing project in Manat,
Puerto Rico.  Three members of the Santiago conspiracy -- Otero,
Romn, and Hidalgo -- identified Candelaria-Silva as a participant
in the Villa Evangelina punto.  Candelaria-Silva was in charge of
crack capsules, while his brothers supervised the distribution of
other drugs.
    The government presented evidence of Candelaria-Silva's
three drug-related arrests.  The first arrest occurred on
August 19, 1992, at the Villa Evangelina Housing Project in front
of Building C, the location of the punto.  An officer arrested
Candelaria-Silva with ten baggies of cocaine and a marijuana
cigarette.  During the booking process, Candelaria-Silva indicated
that he lived at Villa Evangelina Housing Project T-251 in Manat.  
On cross-examination, the arresting officer testified that there is
no Building T in the housing project.
    On February 14, 1993, an officer arrested Candelaria-
Silva at the same location.  Upon hearing the approach of the
officers' vehicle Candelaria-Silva:  (1) ran into an apartment; (2)
gave a woman standing there a large brown paper bag; and (3) told
her to throw it out in the bathroom.  However, the officer seized
the bag before she could destroy it.  Inside the bag were 100
colorless, transparent heat-sealed plastic ziplock bags.  Inside
each of these bags were blue, transparent plastic bags which
contained cocaine.  In addition, there were ten transparent, light
blue plastic bags, each containing a vial of crack.  The brown bag
also contained sixty-two packets of heroin wrapped in aluminum foil
with orange colored stickers with black lettering that said
"Cristal."
    Candelaria-Silva's third arrest occurred on October 31,
1994.  At the time of the arrest, Candelaria-Silva was driving a
BMW automobile with another passenger.  Candelaria-Silva engaged
the police car in a chase.  At one point, the BMW stopped, and the
officer saw a hand holding a firearm extended from an open
passenger side car door.  Upon seeing the officer's rifle, however,
the car sped away.  During the subsequent chase, the officer saw a
gun and other objects looking like trash and papers being thrown
from the vehicle.  Although the gun was never recovered, when the
car was eventually stopped at a roadblock, the officer seized
several bags of marijuana from inside the vehicle.
    The government also presented evidence that the
Candelaria family used their home to process narcotics and to store
weapons.  On November 3, 1993, police officers executed search
warrants for the two Candelaria homes located at 30 Sabana Seca
Ward, Manat.  In the first home, which belonged to Candelaria-
Silva's mother, the officers seized fifty-eight bags of marijuana,
thirty-eight bags of Cristal heroin, and 206 bags of cocaine.  In
the second home, where Candelaria-Silva's brother Eulalio resided,
officers seized two pistols.
    Again on February 14, 1995, officers executed a set of
search warrants on both homes, resulting in the seizure of two
kilograms of cocaine, heroin, marijuana, a revolver, a rifle, four
AK-47 machine guns, ammunition for the weapons, masks, the cutting
agent lactose, scales, envelopes, and vials.
    Additionally, the government presented the following
evidence of Candelaria-Silva's flight from Puerto Rico.  Deputy
U.S. Marshal Anthony Visalli testified that he was assigned the
task of locating Candelaria-Silva and returning him to Puerto Rico.  
As part of this investigation, he arrested Candelaria-Silva as he
exited his residence in Dorchester, Massachusetts on April 17,
1996.  When arrested, Candelaria-Silva stated that his name was
Arturo Martnez.  Upon being asked for identification, he told the
officers it was in his apartment.  The officers conducted a
protective sweep of the apartment incident to the arrest.  After
not finding any identification in the apartment, they brought
Candelaria-Silva outside, and read him his Miranda warnings in
Spanish and English.  Thereafter, Candelaria-Silva revealed his
true identity.  In response to Visalli's question regarding whether
he understood "what this was all about, did he know that . . . he
was wanted in Puerto Rico," Candelaria-Silva said yes.  During a
pat-down incident to Candelaria-Silva's arrest, a Deputy Marshal
seized Candelaria-Silva's wallet containing: (1) a New York State
identification card for Arturo Martnez with a picture of
Candelaria-Silva; and (2) a purchase receipt for a roller bed from
Dick's Furniture City in Detroit, Michigan on January 12, 1995.  
The Deputy Marshal also recovered other papers bearing the name of
Arturo Martnez.
    Candelaria-Silva was brought back to Puerto Rico to stand
trial on charges stemming from an indictment returned June 7,
1995.  Trial commenced on October 21, 1996.  On October 29, 1996,
a jury found Candelaria-Silva guilty on two counts:  the narcotics
conspiracy count and a criminal forfeiture count.  On March 13,
1997, the district court sentenced Candelaria-Silva to 200 months
imprisonment, followed by a five year term of supervised release,
along with a $50 special assessment.
                           DISCUSSION
I.  Rule 12(d) Claim
    Candelaria-Silva argues that the district court abused
its discretion in admitting evidence of his Dorchester arrest,
including testimony about his attempt to use a false name, because
the government failed to meet the notice requirements of Fed. R.
Crim. P. 12(d).  We find his argument without merit.
    Fed. R. Crim. P. 12(d)(2) provides that:
     
    At the arraignment or as soon thereafter as is
    practicable the defendant may in order to
    afford an opportunity to move to suppress
    evidence under subdivision (b)(3) of this
    rule, request notice of the government's
    intention to use (in its evidence in chief at
    trial) any evidence which the defendant may be
    entitled to discover under Rule 16 subject to
    any relevant limitations prescribed in Rule
    16.

    To establish a discovery violation under Rule 12(d)(2),
a defendant must prove that the alleged violation prejudiced his
case.  See United States v. Cruz-Paulino, 61 F.3d 986, 993 (1st
Cir. 1995).  Rule 12(d) is a matter of procedure, rather than a
rule designed to ensure fairness at trial.  See id.  As we have
stated in the past, the rule serves to:  (1) afford the defendant
an opportunity to move to suppress evidence under Rule 12(b)(3);
and (2) avoid the necessity of the defendant moving to suppress
evidence which the government does not intend to present.  See id.  
Rule 12(d) differs from discovery rules designed to ensure fairness
in that it was not designed to aid the defendant in ascertaining
the government's trial strategy.  See id.  The advisory committee's
notes state that no sanction is provided for a violation of Rule
12(d)(2) because automatic exclusion would be too harsh a remedy
given the opportunity for discovery under Rule 16.  See id. at 995
n.6.
    Prior to trial, Candelaria-Silva filed an omnibus
discovery motion.  On October 21, 1996, the prosecutor gave
Candelaria-Silva's counsel a copy of an April 17, 1996 report
prepared by the Deputy Marshal who arrested the appellant in
Dorchester.  The government admits that its designation of flight
evidence was belated.   
    Although appellant's counsel initially gave the district
court the impression that he was arguing that the false name was an
involuntary statement under 18 U.S.C.  3501, see Tr. 10/23/96 at
449 (district court stating "[y]ou did not mention the rule, that's
the impression you gave me before"), he eventually contended that
Fed. R. Evid. 403 prohibited introduction of the arrest as evidence
of flight.  See id. at 456.  The district court heard and responded
to the defendant's arguments.  See Tr. 10/24/96 at 591-612.  
Moreover, counsel for Candelaria-Silva explicitly stated that "I
don't think they have to designate the evidence under Rule
12(d)(2)."  See Tr. 10/23/96 at 452.  Candelaria-Silva had numerous
opportunities to raise his arguments relating to suppression, and
thus, the purpose of Rule 12(d) -- to afford the defense a chance
to move to suppress evidence under Rule 12(b)(3) -- has been
satisfied.  
    Proof positive of the "if at first you don't succeed"
adage, Candelaria-Silva now argues that the items could have been
suppressed as the fruits of an illegal search because the Deputy
Marshal testified on cross-examination that he entered Candelaria-
Silva's apartment as part of a protective sweep.  As an initial
matter, we note that the district court was inclined just to admit  
into evidence the false identification card found in Candelaria-
Silva's wallet during the pat-down incident to his arrest.  See Tr.
10/24/96 at 643.  Incredibly, it was actually Candelaria-Silva who
requested the admission of:  (1) the additional items found in the
wallet, including a receipt for a bed from a Detroit store dated
January 12, 1995, see id. (Candelaria-Silva's counsel stating:  
"Oh, no, to me the documents inside the wallet are important.");
and (2)  envelopes found in his apartment with a return address in
Detroit, Michigan.  See id. at 644-647 (Candelaria-Silva's counsel
stating: "I don't have a problem [with admitting the envelopes into
evidence].").
    Since Candelaria-Silva did not raise the Rule 12(b)(3)
issue in the trial court, he cannot successfully litigate it on
appeal.  See United States v. Delutis, 722 F.2d 902, 909 (1st Cir.
1983).  Further, there is no chance of Candelaria-Silva's proving
that the alleged violation prejudiced his case thereby warranting
a reversal under Cruz-Paulino, since he himself sought admission of
the evidence to corroborate his theory that he was in the
continental United States prior to the return of the indictment.
II.  Rule 16 Violation
    Candelaria-Silva argues that the district court abused
its discretion in failing to exclude evidence that he gave a false
name when he was arrested in Dorchester because of the government's
delayed disclosure of the arrest report.  The discovery obligations
set forth in Fed. R. Crim. P. 16 are designed:
    to contribute to the fair and efficient
    administration of justice by providing the
    defendant with sufficient information upon
    which to base an informed plea and litigation
    strategy; by facilitating the raising of
    objections to admissibility prior to trial; by
    minimizing the undesirable effect of surprise
    at trial; and by contributing to the accuracy
    of the fact-finding process.

Id. (advisory committee note).
    The district court has broad discretion to address
discovery violations in light of their seriousness.  See United
States v. Joselyn, 99 F.3d 1182, 1196 (1st Cir. 1996), cert. denied
sub nom.  Billmeyer v. United States, 117 S. Ct. 959 (1997).  This
Court will not grant the "draconian relief" of suppression and
reversal when it is "grossly disproportionate both to the
prosecutor's nonfeasance and any prejudice to the defense."  Id.
    Candelaria-Silva's failure to request a continuance
resolves his delayed discovery claim.  As we have previously
stated:
    When discovery material makes a belated
    appearance, a criminal defendant must
    ordinarily seek a continuance if he intends to
    claim prejudice . . . . As a general rule, a
    defendant who does not request a continuance
    will not be heard to complain on appeal that
    he suffered prejudice as a result of late-
    arriving discovery.  Thus, in situations where
    defense counsel does not seek a continuance
    upon belated receipt of discoverable
    information, a court often can assume that
    counsel did not need more time to incorporate
    the information into the defendant's game
    plan.

United States v. Seplveda, 15 F.3d 1161, 1178 (1st Cir. 1993)
(citations omitted).  Because Candelaria-Silva never requested a
continuance, we need proceed no further.
III.  Rule 404(b) Claim
    Candelaria-Silva argues that the district court erred in
admitting evidence that Carlos Morales-Garca, a passenger in the
car driven by Candelaria-Silva on October 31, 1994, brandished and
discarded a handgun during a car chase.  We find no such error.
    Because the admission of Rule 404(b) evidence is
committed to the sound discretion of the trial judge, we will
reverse only for abuse of discretion.  United States v. Manning, 79
F.3d 212, 217 (1st Cir.), cert. denied, 117 S. Ct. 147 (1996).
    Fed. R. Evid. 404(b) bars the admission of evidence of
"other crimes, wrongs, or acts if used to prove the character of a
person in order to show action in conformity therewith."  Rule
404(b) provides that although evidence of other crimes, wrongs, or
acts is not admissible to prove criminal propensity, it may be
admissible for other purposes that do not involve character, such
as proof of intent, preparation, knowledge, or absence of mistake.  
See Manning, 79 F.3d at 217.  Moreover, when charges of drug
trafficking are involved, this Court has often upheld the admission
of evidence of prior narcotics involvement to prove knowledge and
intent.  See id.
    Here, the evidence of the arrest was intrinsic to the
conspiracy charge, and consequently, does not fall within the
purview of Rule 404(b).  See id.  ("Evidence intrinsic to the crime
for which the defendant is on trial, accordingly, is not governed
by Rule 404(b).").  The car chase evidence was properly admitted as
probative of: (1) Candelaria-Silva's participation in the drug
conspiracy because there was marijuana in the car that he was
driving; (2) his residence at 30 Sabana Seca Ward, Manat -- the
address given on the arrest report; and (3) his consciousness of
guilt since Morales was also present with Candelaria-Silva in
Dorchester.  Accordingly, we see no error in the admission of the
above evidence.

IV.  Rule 401 and 403 Claims
    Candelaria argues that the district court erred under
Federal Rules of Evidence 401 and 403 in admitting evidence of:  
(1) his flight to Dorchester; and (2) the February 14, 1995
seizures from the family homes located at 30 Sabana Seca.  Neither
claim is persuasive.
    A.  The Seizures
    Fed. R. Evid. 401 defines "relevant evidence" as
"evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more
probable or less probable than it would be without the evidence."  
Id.  "Evidence may be 'relevant' under Rule 401's definition, even
if it fails to prove or disprove the fact at issue -- whether taken
alone or in combination with all other helpful evidence on that
issue."  United States v. Schneider, 111 F.3d 197, 202 (1st Cir.
1997).
    Candelaria-Silva contends that the February 14, 1995
seizure should have been excluded because:  (1) the link between
him and 30 Sabana Seca was too attenuated; and (2) the evidence
seized was inconsistent with the drug distribution methods of the
Santiago-Lugo conspiracy.  Neither claim has merit.
    There are at least four reasons why the link between
Candelaria-Silva and 30 Sabana Seca is not too attenuated.  First,
he concedes, both in his brief and at oral argument, that he
maintained an auto body shop at the residence.  Second, the address
was the residence of multiple members of the Candelaria-Silva
family -- including his mother and brothers -- who were convicted
or pled guilty to being part of the Santiago conspiracy.  Third,
shortly before the search, Candelaria-Silva gave the address to a
police officer while being booked after an arrest.  Fourth, a co-
conspirator testified that he saw Candelaria-Silva at the address
while delivering shipments of cocaine.  Candelaria-Silva's argument
that there is little to connect him to 30 Sabana Seca is thus
disingenuous.
    Candelaria-Silva further contends that the seizure was
irrelevant because the evidence seized was inconsistent with the
drug distribution methods of the Santiago conspiracy -- i.e.
"Cristal" stickers were not affixed to the decks of heroin that day
and the cocaine seized was in different quantities than a co-
conspirator said he had delivered at a previous time.  This
argument overlooks the government's proof that:  (1) the Santiago
conspiracy distributed powder cocaine, crack cocaine, heroin and
marijuana; (2) the homes were used to package and store narcotics
for sale at the Villa Evangelina punto; (3) Candelaria-Silva's
previous arrests involved each of the four types of narcotics
distributed by the Santiago organization; (4) Candelaria-Silva was
previously arrested with 62 packages of "Cristal" heroin -- the
logo of the Santiago conspiracy; and (5) Cristal heroin had been
previously seized from the location.  We see no reason why the
evidence was not admissible under Rule 401.
    In addition, Candelaria-Silva contends that the district
court abused its discretion under Fed. R. Evid. 403 in admitting
testimony and photographs of firearms, guns, drugs, and drug
paraphernalia seized on February 14, 1995.
    Rule 403 provides that "[a]lthough relevant, evidence may
be excluded if the probative value is substantially outweighed by
the danger of unfair prejudice, confusion of the issues, or
misleading the jury, or by consideration of undue delay, waste of
time, or needless presentation of cumulative evidence."  Id.
    Obviously, evidence presented by the government is
prejudicial to the defendant's interests. If it were not, the
prosecution would not be introducing it.  That is why the "law
protects a defendant against unfair prejudice, not against allprejudice."  United States v. Rivera-Gmez, 67 F.3d 993, 997 (1st
Cir. 1995) (emphasis in original).  "The admitted evidence must not
only be prejudicial, but be unfairly prejudicial, and not only
outweigh relevance but substantially outweigh relevance."  United
States v. Rivera, 83 F.3d 542, 545 (1st Cir. 1996).  In conducting
this balancing test, the district court has "especially wide
latitude,"  Rivera-Gmez, 67 F.3d at 997, and "Rule 403 tilts the
balance in favor admission."  Rivera, 83 F.3d at 545.
    There was nothing improper with the admission of the
masks, firearms, and narcotics evidence.  First, most of the
evidence from the seizures was presented to the jury via
photographs thereby reducing the prejudicial effect.  Second, we
cannot say the district court abused its discretion under Rule 403;
the evidence was relevant and its admission not substantially
outweighed by the Rule 403 factors.  In addition, we note that
defense counsel, on the losing side of a Rule 403 argument, always
has the option of asking for a limiting instruction "that the
evidence should be considered not to show the character of the
defendant, but only as proof of intent, operation, plan, knowledge
or absence of mistake or accident."  United States v. Cresta, 825
F.2d 538, 554 (1st Cir. 1987).  We hold that the probative value of
the evidence -- in establishing Candelaria-Silva's involvement in
a far ranging narcotics conspiracy -- outweighed its prejudicial
effect.
    B.  Evidence of Flight
    Evidence of a defendant's flight and attempts to conceal
or falsify identity may be presented at trial as probative of a
guilty mind if there is an adequate factual predicate creating an
inference of guilt of the crime charged.  See United States v.
Tracy, 989 F.2d 1279, 1286 (1st Cir.) (citations omitted), cert.
denied, 508 U.S. 929 (1993).
    Candelaria-Silva's contention is that the adequate
factual predicate is missing in this case because he left Puerto
Rico prior to the return of the indictment on February 9, 1995.  He
alleges that he left Puerto Rico in late 1994 because he was afraid
that his probation would be revoked as a result of his October 31,
1994 arrest.  In substantiating this proposition, Candelaria-Silva
relies on a receipt in his possession at the time of his arrest in
Dorchester for a bed purchased in Detroit, Michigan on January 12,
1995.   
    This receipt does not conclusively prove Candelaria-
Silva's continuous presence in the continental United States prior
to the return of the indictment.  It is conceivable that
Candelaria-Silva visited Detroit, returned to Puerto Rico, and
then, upon learning of the indictment, fled to Dorchester.  SeeUnited States v. Amuso, 21 F.3d 1251, 1258 (2d Cir. 1994) ("The
fact that a defendant's flight is subject to varying
interpretations does not lead inevitably to the conclusion that the
district court abused its discretion in admitting flight
evidence.").
    Here, there was an adequate factual predicate to admit
evidence of flight and Candelaria-Silva's continued absence.  
Candelaria-Silva admits that he fled because he was afraid that his
probation would be revoked as a result of the October 31, 1994
arrest -- an arrest predicated upon conduct that constitutes part
of his participation in the conspiracy.  Further still, he
attempted to conceal his whereabouts by creating a new identity.  
He obtained a false identification card in the name of Arturo
Martnez, rented an apartment under that name, and applied for
credit using that name.  See United States v. Ortiz-Arrigoita, 996
F.2d 436, 440 (1st Cir. 1993) (establishing that a defendant's
attempt to conceal his identity may be relevant evidence of his
guilt); United States v. Boyle, 675 F.2d 430, 432 (1st Cir. 1982)
(stating that use of a false name after the commission of a crime
is commonly accepted as being relevant on the issue of
consciousness of guilt).
    Most importantly, Candelaria-Silva admitted to the Deputy
Marshal after his arrest that he knew he was wanted in Puerto Rico.  
See Tr. 10/24/96 at 617.  Based on the above information, there was
an adequate factual predicate creating an inference of guilt of the
crime charged.  Moreover, any danger that the jury may have given
undue weight to the flight evidence was cured by the district
court's use of this instruction which emphasizes that flight alone
is insufficient to sustain a conviction, and that many innocent
people flee.  Consequently, the district court did not abuse its
discretion to admit this evidence under Rule 403.
V.  Coconspirator Statements
    Candelaria-Silva argues that the following statements
should have been excluded as inadmissible hearsay:  (1) testimony
of Jos Romn-Freites, a manager of the Los Murales punto in
Manat, that Candelaria-Silva was selling crack, and that Santiago
was supplying drugs other than heroin at the Villa Evangelina
punto; and (2) the entire cross-examination testimony of Marcos
Hidalgo, a government witness in two prior trials.  We disagree.
    A.  Romn-Freites
    Federal Rule of Evidence 801(d)(2)(E) excludes from the
operation of the hearsay rule "a statement by a coconspirator of a
party during the course and in furtherance of the conspiracy."  It
is not necessary for the indictment to charge a conspiracy in order
to admit coconspirators' statements under Rule 801(d)(2)(E).  See  
United States v. Campa, 679 F.2d 1006, 1011 (1st Cir. 1982).  
Whether or not a conspiracy has been charged, such statements are
admissible if the district court finds that "it is more likely than
not that the declarant and the defendant were members of a
conspiracy when the hearsay statement was made, and that the
statement was in furtherance of the conspiracy."  United States v.
Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977).  In this circuit,
the district court's ultimate finding on such a matter has come to
be called a "Petrozziello  determination."
    The proper procedure for admitting or rejecting
coconspirator statements is set forth in United States v.
Ciampaglia, 628 F.2d 632, 638 (1st Cir.), cert. denied, 449 U.S.
1038 (1980).  It requires that the district court make its
Petrozziello determination "at the close of all the evidence."  Id.  
If the defendant fails to offer a timely objection, then the
conviction can only be vacated if the record reveals plain error.  
See United States v. Ortiz, 966 F.2d 707, 715 (1st Cir. 1992).
    Here, Romn-Freites testified that Candelaria-Silva was
in charge at the Villa Evangelina punto and that heroin, cocaine,
crack, and marijuana were sold there.  Defense counsel twice
objected when Romn-Freites testified that Candelaria-Silva was
selling crack at the punto on the grounds that the government
failed to elicit the source of Romn-Freites' knowledge.  The
government inquired, and Romn-Freites explained that he had been
promised by Santiago-Lugo that he would be the sole distributor of
Santiago-Lugo's narcotics in Manat.  After hearing that Cristal
heroin was being sold at Villa Evangelina, Romn-Freites went to
the punto to confirm the information.  During his visit, he learned
from "a kid" named El Canito, who was selling cocaine there, that
Santiago-Lugo's heroin was being sold there.  He testified about
his discovery that Santiago-Lugo was selling heroin, cocaine,
marijuana and crack at the Villa Evangelina punto.  Defense counsel
failed to raise any hearsay objections to this testimony.
    At the close of the government's case and again at the
close of Candelaria-Silva's case, the district court made the
requisite Petrozziello findings.  At this point, Candelaria-Silva
again failed to object specifically to Romn-Freites' testimony on
the ground that El Canito was not a member of the Santiago-Lugo
organization or that the statement was not made in furtherance of
the conspiracy.
    For Petrozziello purposes, the critical juncture is the
close of all the evidence.  See Ortiz, 966 F.2d at 716.  At that
juncture in this case, Romn-Freites' testimony went unremarked.  
Under such circumstances, we can vacate the defendant's conviction
on this ground only if the record reveals plain error.  See id.  No
such error is apparent in this case.
    B.  Hidalgo
    Candelaria-Silva complains that the government improperly
elicited hearsay during its cross-examination of Hidalgo.  The
district court did not err in allowing the government's questions.
    Here, defense counsel improperly asked Hidalgo about
comments around town with respect to the activities in which
Eulalio and Moiss Candelaria-Silva were involved.  By limiting his
questions to these two brothers, defense counsel elicited that
these two brothers were in charge of distributing drugs at Villa
Evangelina.  Then, defense counsel asked a broader question about
what the witness had heard about their brother Candy, to which
Hidalgo answered only that Candy was their brother.  Thus, this
portion of the direct examination resulted in inadmissible hearsay,
and left the jury with the incorrect impression that Candelaria-
Silva was not involved in his brothers' drug distribution
activities.  In light of this, the district court reasonably
permitted the government to question the witness about whether
Candelaria-Silva was also known to have participated in his
brothers' activities at the punto.  Thus, the district court
properly employed the doctrine of curative admissibility to admit
otherwise inadmissible evidence in order to rebut prejudicial
evidence which already had been erroneously admitted.  See United
States v. Nardi, 633 F.2d 972, 977 (1st Cir. 1980) (citations
omitted).  
VI.  Jury Instruction
    Candelaria-Silva contends that the district court should
have instructed the jury not to infer guilt from flight unless it
found that the government had proved beyond a reasonable doubt that
Candelaria-Silva was aware that he had been accused.  
    At trial, the district court gave the following
instruction on flight evidence:
    Intentional flight or intentional hiding or
    evasion by a defendant after he is accused of
    the crime for which he is now on trial, may be
    considered by you in light of all the other
    evidence in the case.  On this issue, like
    other matters of evidence, the government has
    the burden of proof.  Intentional flight or
    intentional hiding or evasion after a
    defendant is accused of a crime is not alone
    sufficient to conclude that the defendant is
    guilty.  Flight, hiding or evasion, does not
    create a presumption  of guilt.  At most, it
    may provide the basis for an inference of
    consciousness of guilt.  But flight, hiding or
    evasion may not always reflect feelings of
    guilt.  Moreover, feelings of guilt, which are
    present in many innocent people, do not
    necessarily reflect actual guilt.  In your
    consideration of this type of evidence you
    should consider that there may be reasons for
    defendant's actions that are fully consistent
    with innocence.
         It is up to you as members of the jury to
    determine whether or not evidence of
    intentional flight or intentional hiding or
    evasion shows a consciousness of guilt and the
    weight or significance to be attached to any
    such evidence.

Tr. 10/29/96 at 1089-90.  Although the model jury instruction
merely uses the phrase "intentional flight," the district court
employed the additional language "intentional flight or intentional
hiding or evasion" to reflect that Candelaria-Silva may have fled
prior to the return of the indictment and that his continued
absence after he was aware of the charges against him would be a
potential basis to infer consciousness of guilt. Despite
Candelaria-Silva's objection, the instruction was properly tailored
to the facts of this case.
VII.  Judicial Bias
    Candelaria-Silva contends that the "district court
overstepped its bounds and assumed the role of an advocate for the
prosecution, constantly interjecting in a manner that indicated
annoyance and bias against [] counsel, preventing appellant from
having a fair trial."  Candelaria-Silva Br. at 50.  He then argues
that "space limitations do not allow," id., for a complete listing
of all such instances of inappropriate judicial conduct.  On those
occasions in which the lack of paper or failure to recount one
instance of judicial bias prevents counsel from arguing his point,
our words in United States v. Zannino, 895 F.2d 1 (1st Cir. 1990),
are most appropriate:
    [I]ssues adverted to in a perfunctory manner,
    unaccompanied by some effort at developed
    argumentation, are deemed waived.  It is not
    enough merely to mention a possible argument
    in the most skeletal way, leaving the court to
    do counsel's work, create the ossature for the
    argument, and put flesh on its bones . . . .
    Judges are not expected to be mindreaders.  
    Consequently, a litigant has an obligation to
    spell out its arguments squarely and
    distinctly, or else forever hold its peace.

Id. at 17 (internal quotation marks and citations omitted).  We
resist counsel's request that we conduct "a reading of the entire
record with care," Candelaria-Silva's Br. at 50, as a task that
should have been completed by him in the first place.
                          CONCLUSION
    For the reasons stated in this opinion, we affirm.

</body>

</html>